## GENERAL SESSIONS.

## NEW YORK, JULY, 1810.

*The people of the State of New York*
vs.
*James Melvin, William Abernathy, Thomas Baker, Henry Vane, James Glass, Daniel Allen, John Gibson, Samuel Browning, Henry Bogert, Robert Baird, John Newland, William Cosack, Robert Lambert, Terence Murray, Patrick M'Laughlin, James M' Ninch, Wright M'Farland, William Beach, James Read, John Daly, Geo. Read, John Morehouse, John Gillen, and Nehemiah Bradford.* } CONSPIRACY.

Present—Hon. *Jacob Radcliff*, Mayor.

*Jos. Ogden Hoffman*, Recorder.

Messrs. *Griffin* and *Emmet*, Counsel for the People.

Messrs. *Sampson* and *Colden*, Counsel for Defendants.

The defendants were indicted for a conspiracy. The indictment stated, that ;

The defendants being workmen and journeymen in the art, mystery, and manual occupation of cordwainers, on the 18th October, 1809, &c. unlawfully, perniciously, and deceitfully designing and intending to form and unite themselves into an unlawful club and combination, and to make and ordain unlawful by-laws, rules, and orders among themselves, and

thereby to govern themselves and other workmen in the said art, and unlawfully and unjustly to extort great sums of money by means thereof, on the day and year aforesaid, with force and arms, at, &c. together with divers other workmen and journeymen in the same art, &c. (whose names to the jury are yet unknown,) did unlawfully assemble and meet together, and being so, &c. did then and there, unjustly and corruptly conspire, combine, confederate, and agree together, that none of them, the said conspirators, after the said 18th October, would work for any master or person whatsoever, in the said art, mystery, and occupation, who should employ any workman or journeyman, or other person in the said art, not being a member of the said club or combination, after notice given, &c. to discharge such workman, &c. from the employ of such master, &c. to the great damage and oppression not only of their said masters, employing them in said art, &c. but also of divers other workmen and journeymen in the said art, mystery, and occupation, to the evil example, &c. and against the peace, &c.

2d Count has the same general averments, and states, that the defendants, designing and intending to form and unite themselves into an unlawful club and combination, and to make and ordain unlawful and arbitrary by-laws, rules and orders among themselves, and thereby to govern themselves in, (as in the first count,) and unlawfully and unjustly to exact and extort great sums of money by means thereof, &c. did unlawfully assemble and meet together, and being so met together, &c. did then and there, unjustly, &c. conspire, combine, confederate, and agree, that none of the said conspirators, after the said day, &c. would work for any master or person whatsoever, in the said art, &c. who shall employ any workman, &c. who shall thereafter, infringe or break any or either of the said unlawful rules, orders, or by-laws. Concluding as above.

3d Count. That the defendants conspired, &c. not to work for any master or person who should employ any workmen, &c. who should break any of their by-laws, unless such workman, &c. should pay to the club such sum as should be agreed on, as a penalty for the breach of such unlawful rules, orders, or by-laws, and that they did, in pursuance of the said conspiracy, refuse to work and labour for James Corwin and Charles Aimes, because they, C. and A. did employ one Edward Whitess, a cordwainer, (alleging that the said E. W. had broken one of such rules and orders, and refused to pay two dollars, &c. as a penalty for breaking such rules and orders,) and continued in refusing to work, &c. for C. & A. until the said C. & A. discharged the said E. W. &c. &c.

4th Count. That they (the defendants) wickedly, and intending unjustly, unlawfully, and by indirect means. to impoverish the said Edward Whitess, and hinder him from following his trade, did confederate, conspire, &c. by wrongful and indirect means, to impoverish the said E. W. and to deprive and hinder him from following his said art, &c. and that they, according to the said unlawful, &c. conspiracy. &c. indirectly, unlawfully, &c. did prevent, &c. the said E. W. from following his said art, &c. and did greatly impoverish him.

5th Count. That the defendants did conspire and agree, by indirect means, to prejudice and impoverish the said E. W. and prevent him from exercising his trade.

N'W YORK'
July, 1810.

The People
v.
Melvin
and others.

N'W YORK,
July, 1810.

The People
v.
Melvin
and others.

6th Count. That the defendants not being content to work at the usual rates and prices for which they and other workmen and journeymen were wont and accustomed to work, but falsely and fraudulently conspiring, unjustly and oppressively to augment the wages of themselves and the other workmen, &c. and unjustly to exact and extort great sums of money for their labour and hire in the said art, mystery, &c. _and did_ meet, &c. and being so met, &c. did unjustly and corruptly conspire, &c. that none of them should, after the said 18th of October, work at any lower rate than—

$3 75 for making every pair of back-strapped boots.
2 00 Suwarrow laced boots, full clammed.
1 75 for laced boots in front.
2 37½ for footing back-strap boots.
3 25 for footing Suwarrows.
1 25 for bottoming old boots.

On account of any master or employer, to the great damage not only of their said masters, &c. but of divers other citizens, &c.

7th Count. That the defendants falsely and fraudulently conspired, &c. unjustly and oppressively to increase and augment the wages of themselves and other workmen, &c., and unjustly to exact and extort great sums for their labour and hire, &c. from their masters who employ them, did assemble, and being so assembled, did conspire, &e. that they, and each of them, &c. would endeavour to prevent by threats, and other unlawful means, other artificers, &c. in the said art, &c. from working, &c. at any lower rate than, &c. (setting out the prices in the preceding count, and concluding likewise.)

8th Count states the design to form themselves into a club, as in the three first counts, and to assemble unlawfully, and that they did assemble, and being so assembled, conspired and agreed that none of them should work for any master who should have more than two apprentices, to learn the said art, at one and the same time.

9th Count charges a conspiracy, by indirect means to prejudice and impoverish the following persons, who are all master shoemakers, and prosecutors of the indictment.*

Israel Haviland, John Mills, Timothy Wood, John Peshine, Oliver H. Taylor, William Trowd, Isaac Minard, Samuel Mabbatt, Thomas Lewis, James Corwin, John I. Vanderpool, Christian Covenhoven, William Kidney, Thomas Benton, David Law, Jun. Abraham Merrill, Charles Lee, Thomas M'Kinley, James Jarvis, Charles Aimes, William Benton, and Peter R. Sprainger.

On motion of Mr. Griffin, the following witnesses were bound in recognisance to appear from day to day and testify in the cause : Lewis Judson, Lucius Benja-

---

*This was argued during the mayoralty of the Hon. De Witt Clinton, and exceptions were taken to each count in the indictment. It was drawn by an eminent criminal lawyer, and each count was sustained by the court.

min, Edward Whitess, Oliver H. Taylor, John Wilcox, Charles Aimes, Daniel Corwin, Benjamin Britain, Thomas M'Cready, Webby Slocum, William Frowd.

The jury precept contained twenty-four names of jurors, of whom only eighteen were summoned, the remainder being absent, or not found. And of these there did not appear a sufficient number.

The following were the jurors sworn:—David Wagstaff, John Johnson, James Welsh, William L. Lawrence, Augustus Nicoll, John Ashfield, David Cargill, John W. Livingston, William Brodill, Joseph Dederer, John Queen, Robert Graham.

As the jurors came to the book, they were asked by the defendant's counsel, whether they were master shoemaker's, and, also, whether they were masters or employers in any of the mechanic arts or trades; but none such appearing, they were all permitted to be sworn without farther objection.

A question was put to a juror by a Mr. *Griffin,* on behalf of the prosecution, whether *he had not made up his mind upon the subject of this trial.*[*] He said he had no

> [*] In the case of Aaron Burr who was indicted for treason, it was decided that the proper question to be put to the jurors was, " Have you *made up and delivered* the opinion that the prisoner is guilty or innocent of the charge laid in the indictment." Explanatory questions were allowed by the court, and put by the counsel for the United States, and for the prisoners when necessary. The words of the court in that case were, " that to have made up and *delivered* the opinion, that the prisoner entertained the treasonable designs with which he is charged, and that he retained those designs, and was prosecuting them when the act charged in the indictment is alleged to have been committed, is good cause of challenge." (Burr's Trial, by Robertson, vol. 1. 418.) In Callender's case, a similar question was put, the amount of which was, " Have you made up and *delivered* the opinion, that the prisoner has been guilty of publishing a false, wicked, and malicious libel which subjects him to punishment, under the act of congress on which he is indicted." In Selfridge's case, the following questions were put to the jurors: 1st. " Have you heard any thing in this case so as to have made up your mind?" 2d. " Do you feel any bias or prejudice in this case for or against the prisoner at the bar?" The same questions were put to, and answered by, the jurors in Goodwin's case. On the trial of the mail robbers, Hare and Alexander, in the Circuit Court of the United States, May Term, 1818, Baltimore, each juror was asked whether he had formed and *expressed* an opinion of the guilt or innocence of the prisoner.

knowledge of the particulars of this case, and therefore could not have made up his mind. Upon this Mr. John Johnson, another of the jurors, observed that he had so far made up his mind, that he could see no reason why journeymen should not meet to regulate their own demands as well as other men. This declaration was made a ground of challenge for favor by the prosecutors' counsel, and the three jurors first sworn, viz. James Welsh, John Ashfield, and David Cargill, were sworn, to try whether the said John Johnson was an indifferent juror between the parties or not.

David Codwise, Esq., counsellor at law, having been seated opposite the jury box, was called and sworn to testify to the words of Mr. Johnson. The prosecutors, however, withdrew the challenge, and the juror was sworn.

Mr. Queen was also challenged, for favour, and examined on his *voire dire*. The ground of challenge to Mr. Queen was, that his brother, who was now absent from this city, had been, during his residence here, about six months ago, a member of the Society of Journeymen Cordwainers, and that he might still be understood to be a member; if so, the penalties would fall upon him, provided the acts of that body were held to amount to a conspiracy, and for that reason his brother could not be an impartial juror. The same triors were sworn. Mr. Queen was examined on his *voire dire*. Two witnesses, Thomas Wilson and George Gould, were examined in chief. The counsel summed up the evidence, and the triors found Mr. Queen an indifferent juror between the parties: he was accordingly sworn.

The court imposed fines on several persons summoned as jurors, for their non-attendance, and adjourned the

trial of the indictment till 10 o'clock on the following day.

The jury sworn were permitted to go at large* by consent of the parties; the court first admonishing them of their duties, and of the necessity of shutting their ears to all conversations touching the subject they were sworn to determine upon.

On the part of the prosecution, the counsel proceeded to prove the rules of the society by parol, having previously given notice to the defendants' counsel to produce all books and papers of the society, and having proved the same to have been in the hands of Baker, one of the defendants, who was secretary of the society. The first witness, Benjamin, proved the rules as contained in their constitution printed in 1805, and afterwards re-enacted. He also testified to some additional by-laws or amendments. He could not say that the printed constitution now produced was a copy of the former, and the defendant's counsel at first objected to its being given in evidence as such; but in the course of the examination thought proper to admit it.

It was farther proved, and not denied by the defendants, that on several occasions measures had been taken to give effect to their constitution, or rules, by giving notices to masters having journeymen or apprentices in their employ not members of the body; viz. for having more than two apprentices, or employing apprentices other than those of the members of the society; also, for employing journeymen who had infringed their rules. The notice in such cases was, that if they persisted to employ such persons, &c. or to disregard the rules of the body, their shop should be deserted by all the workmen of the society. This had been in some instances effect-

*N'W YORK, July, 1810.*

*The People v. Melvin and others.*

*In Fries' case, which was for treason, the jury rode into the country with an officer during the trial.*

ed by means of what they called a *strike against the shop*, and the offending member was then termed *a scab*, and wherever he was employed no others of the society were allowed to work. There was a strike against the shop of Corwin & Aimes, but as it appeared to the society that they contrived to defeat its operation by privately getting their work done at other shops, the society, in November, 1809, ordered a general strike against the masters. There were one hundred and eighty-six members, and about as many journeymen who were not members, but all the best workmen were of the society. Benjamin, who testified as to this general strike, said he never knew of but one general turn out. He testified, that he had been fined and threatened for working against the rules of the society. He admitted, on his cross examination, that he came voluntarily into the society, and also, that on the question for a general turn out, the members voted by secret ballot, and that no compulsion is used, but every man votes according to his inclination, the majority carries it, and then it becomes a law, and the contraveners of it are scabbed. Edward Whitess had worked for Corwin & Aimes, about four or five years, and had joined the society about six or seven years ago. He was fined at different times, and at the time of the general meeting there was a *rumpus* in the society, which, with the multiplicity of the fines, determined him to leave it, and change his occupation, and take to cramping boot legs. He had, while a member, acted as sexton to a church, for which he had sixty dollars yearly. This prevented his attendance, and occasioned him sometimes to be fined. During the time he was first scabbed, his employer was obliged to discharge him until he paid his fine and was reinstated. He admitted that he came

voluntarily into the society, and remained in it six or seven years.

Mr. Aimes proved that he had received several notices, one to discharge Whitess, which he complied with; another to discharge a boy, an apprentice of Britton, who had worked with him two or three years. Witness thought it a great hardship that the old man should lose the profit of the work of the apprentice he had instructed, and did not discharge him, for which the body struck against him. On cross-examination, he admitted he had contributed some money towards carrying on this prosecution.

James Britton confirmed this testimony, and said, that after he had instructed his apprentice, whose work was his chief support, (he himself being in years,) he was deprived of that help by the influence of the body of which he was not a member.

Thomas Lewis was also examined; his evidence was not very material, being only confirmatory of the above particulars.

The defendants offered to show, as well from the witnesses on the part of the prosecution, as from other witnesses whom they should call,

1st. That long ago, prior to the strike or turn out, there was a combination of the masters for the express purpose of lowering the wages of the working men, and which was oppressive to them; and that their society originated in the necessity of protecting themselves against such combinations; and further, that the masters were now in combination for the purpose of this prosecution.*

This was objected to and overruled, upon the ground that the misconduct of the masters would be no justifica-

*Margin notes:*

N'W YORK, July, 1810.

The People
v.
Melvin
and others.

*It has been repeatedly decided in this court, that one conspiracy cannot justify another. In the case of the People v. Trequir et al. vol. i. p. 146. which was a case of conspiracy of the journeymen hatters, Mr. Price, their counsel, offered to prove a conspiracy among the master hatters, and that the association of the journeymen was merely to counteract the combination among the masters. The court refused to hear the evidence, and the defendants were convicted.

N'W YORK,  tion of the defendants. It was then offered as evidence
July, 1810.  in mitigation, but the court said, that if there were cir-
The People  cumstances merely in mitigation of the sentence, they
v.  would come more properly in affidavit in case of convic-
Melvin  tion.
and others.

2d. The defendants attempted to show, that the wages
and rates contended for, and demanded by, the journey-
men, were reasonable, and no higher than to afford them
a bare maintenance.

This evidence was not received, because none had ap-
peared on the part of the prosecution, to show, that un-
reasonable or extravagant demands had been made. It
was therefore held irrelevant to rebut what had not been
proved.

3d. The defendants proposed to prove, that the masters
made an excessive profit on the labour of the workmen;
but this was refused also, upon the former ground, that the
misconduct of the masters would not justify a conspiracy
or illegal combination in the journeymen.

The court having, in the morning, intimated, that it
would sit till twelve o'clock, rather than adjourn, defen-
dants' counsel were called upon to sum up, and Mr.
Sampson, pursuant to arrangement with Mr. Colden, com-
menced.

Mr. S. observed, that the difficulties under which he labour-
ed, were beyond his force, and he was conscious that entering
upon an argument of such a nature, under such disadvan-
tages, was a forlorn endeavour. The evidence given did
not in any shape alter the principles upon which he had ar-
gued six months ago, for the quashing of the indictment.
That argument [alluding to his argument upon a prior hear-
ing of this case] was addressed to a court of law, and found-
ed upon the law, supposing all the facts charged in the in-

dictment to be proved. Nothing, certainly, had come out in evidence to prejudice the defendants, for there was not a single instance of violence or disorderly conduct, and it was conceded, that the demands of the workmen were not unreasonable or extraordinary. The single question would be, as it was considered by him, whether the law of England was to govern this case. He was aware how far the doctrines of the English law upon this head had unfortunately given a bias to the judgment of many individuals; and no doubt, some of those whom chance had arrayed to sit in judgment on this cause, must be presumed, however honourable and intelligent, to have imbibed more or less of that opinion. The jury, it is true, are judges of law and fact in criminal cases, and the arguments necessary to disentangle the question from such preconceived notions, must be of a nature too prolix and arduous to be offered, with a fair prospect of success, to a jury already exhausted and fatigued by a painful sitting, at a season when the powers of mind and body languish. Mr. S. farther observed, that in the former argument, he had found it necessary to turn over many volumes in order to show grounds for his opinions, and to cite numerous cases which it would be impossible now, at candle light, with sight so fatigued, and faculties so exhausted, and in a state of health so ill suited to exertion, to resort to. The very circumstance of his having undertaken to report the former arguments, with all the tiresome labour of transcribing, compiling and correcting of the press, had effaced the livelier impressions of first conceptions, and must impart to what he should offer the vapid insipidity of a tale twice told. The many books already referred to, and now produced by the opposite counsel, seemed to forewarn him that they meant to renew the learned efforts of the former contest, and many of them referred to by Mr. Griffin were not noticed till the moment it was necessary for him to reply to them, when it was impossible for him to answer

N'W YORK, July, 1810.

The People v. Melvin and others.

but from vague recollection or repetition of his former argument, or reference to the printed report. [Mr. S. in referring to his former argument, read the authorities from the printed report, but omitted much the greater part, from unwillingness to fatigue the attention of the jury already exhausted. After he had concluded, it was thought too late to hear the other counsel, and the court adjourned till the following day at ten o'clock.]

Mr. *Colden* followed Mr. *Sampson*, and re-examined the principles of the law, and the leading authorities; reasoning upon them, and applying them to the case with great discrimination and ability. Admitting all the cases cited againt the defendants from the English books to be of full authority, that none of them would warrant a conviction. It seemed to him, that the moment it was admitted that the object of the conspiracy was not criminal, there ought to be an end of the prosecution. And the doctrine and argument touching a conspiracy, to do a lawful act by unlawful means, seemed to him a distinction without a difference, an unnecessary refinement, and at best a begging of the question. To conspire to use unlawful means, was to conspire to do an unlawful thing, and was an unlawful conspiracy. All that he admitted freely. But when that was admitted, the question, whether there had been such a conspiracy, was not a whit advanced, and he contended as confidently as before, that there had not. He read and commented upon the constitution of the society, and maintained that all the words of coercion with which it abounded, all the terms of arbitrary command, which might furnish such fertile subjects for declamation, were innocent and harmless, and would be so considered by candid judgment, when the undeniable truth was taken into the account, that the only compulsion they used was a refusal to work with those whom they considered as joining in oppression against them. There was a well-received and settled definition of crimes, by which they

were divided into two comprehensive classes, those called *mala in se*, which were crimes against the universal laws of God and nature, and those termed *mala prohibita*, or offences against positive institutions. There must in this country be statutes enacted by the legislature, which speak the will and voice of the people. Beyond this definition there can be no crime, and it is impossible to draw the re-fusal of a body of men to labour under terms disadvantageous to themselves, or which they think disadvantageous to them, under either branch of this definition, without more subtlety than ought to be admitted in the law; and more straining than the genius of our code allows, to be used against defendants in any criminal case.

Mr. *Griffin* first summed up on the part of the prosecution. The law having been already so fully discussed, and the necessary limits of this report rendering it necessary to compress the account of the trial, on which the facts were few, and of no great interest or novelty, nothing more can be given than the outlines of the summing up.

To the authorities cited by the counsel for the prosecution on the former argument, Mr. Griffin added the following: Rex v. Rispal, 3 Burr. 1320, the remarks of Lord Mansfield and Justice Yates, on the subject of conspiracies, in Virtue v. Lord Clive, 4 Burr. 2475, 6, the observations of Justice Grose on the same subject, in Rex v. Mawbey *et al.* 6 D. & E. 636, and the cases of Rex. v. Hammond *et al.* 2 Esp. Rep. 719. Rex v. Locker *et al.* 5 Esp. Rep. 107. Rex v. Salter *et al.* 5 Esp. Rep. 125.

Mr. Griffin applied himself very forcibly in answer to the observations of Mr. Sampson, upon the common law; and instead of judging it by the sharp rules of criticism, desired that it might be fairly and candidly judged by its effects. He drew a comparative view of the condition of the English people, and the English peasantry, with that of the people of the continent of Europe; of the independence

N'W YORK,
July, 1810.

The People
v.
Melvin
and others.

of the one, and the debased and servile condition of the other. Admitting that the national code was the source of national improvement, manners, and civilization as was argued by Mr. Sampson, what better eulogim could be passed upon the common law of England than the flourishing and happy situation of the nation where that code prevailed; if the people of England, with all their grievances, are so much above the servile state of boors, or the debased and benighted condition of those of Spain and Portugal, and other countries where the sword and the inquisition govern without control of law, it must be, even from the argument of his opponent, that the national code is more exalted and more beneficial.

Why is it, added he, that " slaves cannot breathe in England?" Why is it, that " they touch that country and their shackles fall?" It is the common law which strikes off their fetters, it is the common law which expands them into freemen.

If England, in the times of general disorder throughout Europe, escaped almost singly from the devastations of civil war, revolution and invasion, it was owing to the love of the laws that animated the people to contend, heart and hand, for their precious birthright, and to the genius of their constitution that watched over their destiny. What else had protected the English people from guillotine, bastile and inquisition? What else had implanted in the United States the principles of freedom which had grown up and matured, and finished in their perfect independence? Why was their condition even as colonies, so much above that of Brazil or Mexico, countries towards which nature had been perhaps more lavish of her favours? It was the principles of the common law which our ancestors brought with them, which first prompted them to assert their independence, and then in the days of trial and of strife, moderated the fury of revolution, and served as sure and solid foundations of future security. It

was in that free and hallowed volume which served as their palladium, and in which they found written the first lessons of their independence. It was the mild spirit of the common law that tempered the evils of civil convulsion and calmed the agitated waves, and finally shone forth with renovated lustre when those storms had passed away ; that common law, the great magazine which supplied our state and national constitutions with abundant and useful materials for their solid structure.

Mr. Griffin then argued upon the evidence, and admitted that there had been no personal violence, no outrage or disorder, but asked if the coercive measures of the society were less cruel or oppressive for that reason. He made strong remarks upon the imperious and tyrannical edicts of the constitution and by-laws of the society, and asked whether it was possible for any workman to enjoy, without molestation, the indisputable rights of peace, neutrality, and self-government, in his own private and particular concerns. A journeyman was neither free to refuse entering into the society, nor at liberty, having done so, to leave it without incurring ruin or unmerited disgrace ; and to the real impoverishment which he must undergo, and to the evils heaped upon all who befriend him—to all this was added, the opprobrious epithet of *scab*. If an individual master refused obedience to their laws, or fell under the displeasure of the society, a stroke was directed against him. And, though the stroke was not a corporal wound, it was a cruel and ruinous infliction, from which he could have no relief, unless the law provides one. He was proscribed without remorse, and outlawed without mercy.

If the master workmen in general happened to offend this society, a general cessation of labour amongst the members of their own body was decreed, to which obedience was rigorously enforced ; however much the necessities of their families might require their work, idleness was enjoined upon them. They were commanded to do no man-

ner of work; but it was a Sabbath not of rest, but of vengeance, of desolation, and of suffering. Mr. Griffin urged then a variety of other topics with great strength and effect, and concluded by what might be understood as a summary of his argument. He did not complain of the defendants for forming themselves into a society, but for compelling others to become members. He did not accuse them of having advanced the price of their own labour, but of conspiring to regulate, by measures of rigour and coercion, the wages and the will of others; his charge against them was not that they chose and determined for what employers they would or would not work, but that they had exercised an aristocratic and tyrannical control over third persons, to whom they left neither free will nor choice; and that they employed, to effect this purpose, means of interference in their concerns to which it was impossible for the sufferers to oppose any resistance:

Mr. *Emmet* closed the prosecution. Before he began, Mr. Sampson cited a passage from Reéve's History of the Common Law, to show that besides the ordinances to which he had adverted, all to be found in Keble's Statutes, there was a special jurisdiction and particular laws touching the staple of wool, and that the charge of conspiracy against the merchants in the reign of Edward III. might have very possibly been for an infringement of that code, which was called the law of the staple. So that there were two ways of accounting for it, viz. by the general statutes, or by these particular regulations, in neither of which it could be an argument that such conspiracies were by the common law. Mr. S. said he would go no higher into antiquity. If his learned friend chose to do so, he might now mount up Jacob's ladder, of which one end was in this world and the other in the world above. Mr. S. also cited a certified opinion of Judge Scott of Maryland, in MS. where two cases

were adjudged, one, where after conviction a new trial was refused, and another, when on demurrer to evidence judgment was for the defendant; on this distinction, that where the party said to be injured went voluntarily into the society, there was no injury done him, however it might be if he was compelled. This, he said, was applicable to the cases of Benjamin and Whitess, both of whom had entered voluntarily.

Mr. Emmet declared that it was not his intention to advert on this occasion to a single law case, nor to open one of the numerous authorities that lay upon the table, because he had observed with what pain the jury had endeavoured to listen to the elaborate arguments of his learned adversaries, whenever they turned upon abstruse deduction from the antiquities of the law. He neither blamed the counsel nor the jury in this respect; both had tried to do their duty, and he could not withhold his admiration of the research and ingenuity of his friend, who had shown such force of learning and industry. But it was plain that it was but labour in vain; for it never could be expected from the most intelligent jurors that ever were empannelled, that they should, in the incidental discharge of a duty for which they had no previous course of preparation, following the ablest and clearest logician through a range of argument which it must have cost a practised and educated lawyer so much time and trouble to compose. It was what never was required of any jury; and it was not within their province, nor were they the worse jurors for not being deep read lawyers. The constitution had appointed two distinct offices: Judges had to determine questions of law, and jurors to decide upon questions of fact; and although the jury in criminal cases had the undoubted power when they chose to exert it, of deciding upon law and fact, yet that was a right or power which a discreet jury would never assert but in

cases where the strongest exigencies required them to do so. There were indeed occasions, when important public principles were in jeopardy, when it might be used as a saving and salutary privilege ; but nothing less than such occasions would warrant a jury to pronounce upon what no understanding, by the simple force of common sense, could be equal to. The certainty of the criminal law is as important as that of the civil, and that can only be preserved by leaving it to be expounded by judges, to whom education and habit have rendered it familiar, and who join knowledge of its theory to the aptitude which practice gives. Discreet jurors know that no science is intuitive, and that law, which comprehends the rules of all men's actions, can never from its nature be so simple as that some difficulties must not at times arise in the exposition of it. When they do, it is impossible to lay down the rule, but from a knowledge of what has been established by usage or by statute, and to do so safely, a knowledge of causes and consequences, which practice only gives, is essential. As well might a lawyer think himself qualified without any previous education, to be a merchant, a farmer, or an artist, as any of those to be a lawyer. And this plainly appeared to me in the course of the summing up on the other side. Where it turned upon the facts in evidence, I saw the jury giving an attentive ear ; where it was general reasoning, I could mark them listening with patience ; where it was humour and fancy, I saw the pleasure they received, and I joined in it, for wit and vivacity will always captivate and please ; but when that laboured chain of induction which did credit to the industry and reasoning powers of my learned friend, was offered to the jury-box, I could discern in their individual countenances the truth of that sentence which says, " to questions of law jurors are not to answer."

One observation, however, touching the strictures pass-

ed upon the absurd antiquities of the common law ; and I am far from denying the barbarity of its origin, and that it originated in dark and ignorant times.   It is this ; that its course has been marked with progressive improvement, which alone is elugium and security enough.   Mr. Emmet then passed to the constitution of the society, and dwelt with his usual force upon several of its provisions, which he represented as arbitrary and tyrannical, and going to erect an *imperium in imperio*, and overbear the rights of the citizen and the law of the land.

N'W YORK, July, 1810.

The People v. Melvin and others.

He took advantage of the hardship of *Briton's* case, and drew a lively and pathetic picture of the sufferings of an inoffensive old man, and of the cruelty of exacting from his employer the hard sacrifice of his abandonment, at the peril of his own destruction.   He said he was not the advocate of any oppression, and if the masters had combined for any purpose of oppression, or in any shape against law, he would wish as much as any man that they should be indicted and convicted.

His address was such as the reporter would willingly lay before the public, did the limits prescribed to him admit of it ; but the same reasons for which the speeches of the other counsel have been abridged, must serve as his apology.

The charge of the court was then delivered by his honour the *Mayor*, to the following effect.

He observed there were two points of view in which the offence of a conspiracy might be considered ; the one where there existed a combination to do an act, unlawful in itself, to the prejudice of other persons ; the other where the act done, or the object of it, was not unlawful, but *unlawful means** were used to accomplish it. As to the first, there could be no doubt that a combination to do an unlawful act was a conspiracy.   The sec-

* The gist of a conspiracy is the unlawful confederacy to do an unlawful act, or even a lawful act for an unlawful purpose. The offence is complete when the confederacy is made ; and any act done in pursuance of it, is no constituent part of the offence.   3. Mass. Rep. p. 329. Ante, v: 1, p. 223.

ond depended on the common principle that the good-ness of the end would not justify *improper means* to obtain it. If, therefore, in the present case, the defendants had confederated either to do an unlawful act, to the injury of others, or to make use of *unlawful means* to obtain their ends, they would be liable to the charge of a conspiracy. He observed, that the court did not mean to say, nor did the facts in the case require them to decide, whether an agreement not to work,* except for certain wages, would amount to this offence, without any unlawful means taken to enforce it.

Much has been said as to the application of the common law of England to the case. The absurdities of the ancient common law, and also of the statute law of England, had been exhibited in the strongest light. It was well known, that many of the ancient rules of the common law on this and other subjects had been exploded or become obsolete, and that little of the mass of absurdities complained of by the defendants' counsel, remained in force even in England. In this state the court could not be at a loss in deciding how far the common law of England was applicable. Our immediate ancestors claimed it as their birthright. They considered it as securing to them many of their highest privileges, and they often appealed to that law in support of their rights, and against the arbitrary extension of power by the British parliament. The constitution of this state had also expressly adopted it, and declared, that such parts of the common law of England, and the statute law of England and Great Britain, and of the acts of the legislature of the colony of New York, as together did form the law of said colony on the 19th April, 1775, and not repugnant to the constitution, should be and continue the law of this state, subject to such alterations and provisions as the

* Journeymen confederating and refusing to work, unless for certain wages, may be indicted for a conspiracy, for this offence consists in the *conspiring,* and not in the *refusal,* and conspiracies are illegal, although the subject matter of them be lawful. 8 Mod 11, 320. A bare conspiracy to do a lawful act to an unlawful end is a crime though no act be done. in consequence thereof. 8 Mod. 321. See the cases collected, vol. i. p. 150, 151.

egislature of this state shall from time to time make con-
cerning the same, &c. No alteration having been made
by our constitution or laws, the common law of England,
as it existed at the period last mentioned, must be deemed
to be applicable, and by that law the principles already
stated appeared to be well established. No precedents, it
was true, of convictions or judgments upon them had been
produced from our own courts, but no strong inference
could be drawn from that, as until lately such precedents
had not been preserved, and no printed reports of adjudged
cases had been published.

The injury produced by unlawful combinations might
affect any person or number of persons, as in the present
case the master workmen, or the fellow journeymen of
the defendants, or any other individuals. It appeared
in evidence, that the society of journeymen, of which the
defendants were members, had established a constitution,
or certain rules for its government, to which the defend-
ants had assented, and which they had endeavoured to
enforce. These rules were made to operate on all the
members of the society, on others of their trade who
were not members, and through them on the master
workmen, and all were coerced to submit, or else the
members of the society, which comprehend the best
workmen in the city, were to stop the work of their em-
ployers. One of the regulations even required that
every person of their trade, whom they thought worthy
of notice, should become a member of the society, and
of course become subject to its rules, and in case of neg-
lect or refusal, it imposed fines on the person guilty of
disobedience. When the society determined on any
measure, it found no difficulty in carrying it into execu-
tion. If its ordinary functions failed, it enforced obe-

dience by decreeing what was called *a strike* against a particular shop that had transgressed, or a general turn out against all the shops in the city, terms which had been explained by the witnesses, and were sufficiently understood. · These steps were generally decisive, and compelled submission in all concerned.

Whatever might be the motives of the defendants, or their object, the means thus employed were arbitrary and unlawful, and their having been directed against several individuals in the present case, it was brought, in the opinion of the court, within one of the descriptions of the offence which has been given.

The jury retired, and shortly after returned a verdict against the defendants.

The sentence was then passed by his honour the Mayor, who observed to the defendants, that the novelty of the case, and the general conduct of their body composed of members useful in the community, inclined the court to believe that they had erred from a mistake of the law, and from supposing that they had rights upon which to found their proceedings. That they had equal rights with all other members of the community was undoubted, and they had also the right to meet and regulate their concerns, and to ask for wages, and to work or refuse ; but that the means they used were of a nature too arbitrary and coercive, and which went to deprive their fellow citizens of rights as precious as any they contended for. That the present object of the court was rather to admonish than to punish ; but an adjudication upon the subject being now solemnly had, it was recommended to them so to alter and modify their rules and their conduct, as not to incur in future the penalties of the law.—They were fined each one dollar, with the costs.